United States District Court
Southern District of Texas

**ENTERED**

February 17, 2026

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| John J. Dierlam, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-25-0123 |
| | § | |
| Donald Trump et al., | § | |
| *Defendants.* | § | |

**MEMORANDUM AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). ECF No. 79. Pending before the court is Plaintiff John Dierlam's Motion for Preliminary Injunction, ECF No. 15, and Defendants' Motion to Dismiss, ECF No. 30. Because Dierlam lacks Article III standing, the court recommends that Defendants' Motion to Dismiss, ECF No. 30, be **GRANTED** and that Plaintiff's Motion for Preliminary Injunction, ECF No. 15, be **DENIED as MOOT**.

### *1. Background*

John Dierlam, who is religiously opposed to, among other things, abortion, contraceptives, and gender affirming care, brings claims related to the Patient Protection and Affordable Care Act (ACA) and its corresponding regulations. First Am. Compl. (FAC), ECF No. 29 at 64–65. Dierlam filed suit against the Department of Health and Human Services (HHS), Department of the Treasury, and Department of Labor along with several individuals in their official capacities as government actors (collectively, the Government). *Id.* at 1.

Dierlam's 170-page FAC covers many topics. Dierlam discusses the "unconstitutional rise of fascism in the United States," FAC at 23–26, at 17–19, "the corruption of the medical

profession," *id.* at 26–30, and the "Leftist Abuse of Science and Leftist Philosophy," *id.* at 36–40. The FAC also contains many pages of allegations that do not appear to be related in any way to the present lawsuit. The court has endeavored to put all of Dierlam's irrelevant allegations to the side and ferret out the substance of his complaints. Having done so, the court understands Dierlam to be complaining about certain changes to Medicare that HHS implemented by regulation in 2024. He argues that the regulations HHS promulgated in 2024 violate various statutes and provisions of the Constitution and that participation in Medicare would require Dierlam to violate his own religious beliefs. *Id.* at 17–21.

Dierlam is not specific about which regulations he is attacking. He cites a Notice of Final Rule, which is 182 pages long and which altered many provisions of the Code of Federal Regulations. *See* Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37522 (May 6, 2024) (the Final Rule). Dierlam states that he "challenge[s] the defendant's regulations regarding, Section 1557 of the ACA, 'minimum essential coverage,' the Individual Mandate, the Individual Mandate Penalty, the bill sharing ministries, and all other provisions of the ACA which touches on any of the counts to follow." FAC at 7.

Dierlam explains that his Catholic religion forbids even indirect participation or support of abortion and that doing so subjects him to penalties including ex-communication from the Church and possible eternal damnation. FAC at 46. Dierlam argues that various provisions of the current regulatory framework would place him in violation of his religious beliefs were he to participate in Medicare. For example, Dierlam alleges that three contraceptive methods that Medicare covers can also be used as abortifacients or could have that effect. *Id.* He explains that because the Final Rule requires Medicare to cover those

drugs, "it is impossible for [him] to enroll in Medicare or any other health insurance as no religious exemption for the individual exists." *Id.* at 47. Dierlam also alleges that the Final Rule contains a "definition of sex to incorporate gender affirming care, gender identity, and pregnancy discrimination into all health insurance including Medicare." *Id.* at 62. He also explains that HHS prohibits discrimination on the basis of sexual orientation, gender identity, sex characteristics, pregnancy, and sex stereotypes. *Id.* at 62–63. He takes the position that the "HHS Mandate is expanded to cover gender mutilation and experimental off-label hormone therapies." *Id.* at 63. Because of these alleged expansions of Medicare's coverage, enrolling in Medicare would be in violation of Dierlam's religious beliefs. As another example, Dierlam complains that Medicare now covers "PrEP" drugs, which Dierlam describes as being used "by homosexuals before sex to prevent the spread of certain diseases." *Id.* at 64. Dierlam points out that his Catholic teachings require everyone to be celibate, except after marriage between a genetic male and a genetic female. *Id.* He explains that "LGBTQI+ are not immutable characteristics but activities forbidden by [Catholic teachings]." *Id.* at 64–65. He takes the position that "[p]ayment of premiums to support others in these activities constitute indirect participation and support." *Id.*

Dierlam has not enrolled in Medicare or other insurance because he believes that all options available to him require that he abandon his faith. FAC at 51, 83. Dierlam also argues that he faces substantial lifetime penalties for signing up for Medicare after the required time frame. *Id.* at 82. As Dierlam puts it,

> I am required to sign a contract and/or pay premiums to support a system which will harm individuals including innocent children to obtain health care. Just as during 2013 to 2020, it is impossible to find ANY health insurance including Medicare, compliant with my religion. The government is unconstitutionally

3

> making an important benefit "enjoyed by other citizens" conditional upon the acceptance of its belief system.

*Id.* at 83–84.

The court notes that Dierlam litigated an earlier case, that he brought while employed, in which he alleged similar violations related to the individual mandate and prior HHS regulations and the impacts those regulations had on his private insurance options. *See, e.g.,* FAC at 46, 55, 102. In his previous case, it appears to the court that Dierlam was found to have standing and that he received a refund of the shared-responsibility payments he made under the ACA from 2014–2017. *Dierlam v. Biden*, No. 23-20401, 2024 WL 863355 (5th Cir. Feb. 29, 2024), *cert. denied*, 145 S. Ct. 278 (2024). The remainder of the case was ultimately dismissed. *Id.* The case currently pending before the court is related to the effects that the Final Rule and related regulations had on Medicare, not private insurance through an employer.

Dierlam has brought eighteen causes of action, including claims under the Administrative Procedures Act, the Religious Freedom Restoration Act, and various constitutional claims under the First, Fourth, Fifth, and Ninth Amendments. FAC at 86–161. Dierlam seeks a preliminary injunction "such that all Mandates like [the Government's] ultra vires 'contraceptive mandate,' 'gender affirming care,' 'pregnancy discrimination,' 'gender discrimination,' IVF and any other regulation in the area of health care and/or 'minimum essential coverage' which impacts faith and morals is suspended and held unenforceable until this case is decided." ECF No. 15 at 16. Dierlam also asks the court for various forms of relief, such as to "set aside and hold unlawful the HHS Mandates[,]" and to "prevent the defendants from imposing any regulation in the future which can impact faith and morals[, and]" declare the ACA unconstitutional. FAC at 165–169.

The court accepts as true that Dierlam is a devout Catholic and that he believes in what he says in the FAC. The court also does not at this stage of the proceeding take issue with Dierlam's reading of the Final Rule and the other regulations that he is referring to. Assuming for the sake of discussion that Dierlam has a firmly held religious objection to the Final Rule and the related regulations, and that the Final Rule and regulations have the impacts he alleges, Dierlam still lacks standing to bring the claims he asserts.

### 2. Legal Standard and Analysis

The court liberally construes Dierlam's pro se pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Even doing so, the party invoking subject matter jurisdiction has the burden to prove standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 185 (2000). The burden changes "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation omitted). The elements of constitutional standing are that the plaintiff: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338.

The Government argues that Dierlam does not have standing. ECF No. 30 at 7–10. According to the Government,

because Dierlam has not enrolled in Medicare, his injury is not actual or imminent. *Id.* The Government also argues that Dierlam's claims are not redressable because the relief he seeks violates separation of powers and goes beyond the scope of available relief. *Id.* at 9.

Throughout all of his many claims for relief, Dierlam argues that he is effectively required to choose between violating his religious beliefs and obtaining Medicare. Dierlam also argues that, because he is older than 65, if he enrolls in Medicare now, he will be charged an increased premium. ECF No. 33 at 8–9. Dierlam alleges that he has suffered retrospective, current, and prospective injuries. FAC at 80–86.[1]

The first question, and the question that is dispositive of this case, is whether Dierlam has or will suffer an injury in fact. To establish an injury in fact, the plaintiff must have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "particularized," it must personally affect the plaintiff in an individual way. *Id.*; *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011). "When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . standing is not precluded, but it is ordinarily

---

[1] To the extent that Dierlam relies on the individual mandate and the general availability of insurance in the marketplace to allege his claims, Dierlam's prior suit already addressed those issues. As the court previously held, "Congress effectively nullified the penalty by setting its amount at $0," and Dierlam's claims are moot. *Dierlam v. Biden, et al.,* 4:16-cv-0307, ECF No. 121 at 7; *California v. Texas*, 593 U.S. 659, 669–70 (2021) ("Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury—the costs of purchasing health insurance."); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 687 (2020) ("the Federal Government has arrived at a solution that exempts the [religious objectors] from the source of their complicity-based concerns").

'substantially more difficult' to establish." *Lujan*, 504 U.S. at 561–62.

The court recognizes that some courts have found individual plaintiffs to have constitutional standing to complain about the ACA's effects on their private insurance options. A judge in the Northern District of Texas found that the plaintiffs had standing to challenge regulations related to the ACA as purchasers of private health insurance through their employer. *Braidwood Mgmt. Inc. v. Becerra,* 666 F. Supp. 3d 613, 622 (N.D. Tex. 2023), *aff'd in part, rev'd in part and remanded,* 104 F.4th 930 (5th Cir. 2024), *cert. granted in part,* 145 S. Ct. 1038 (2025) *and cert. denied,* 145 S. Ct. 1053 (2025) *and rev'd and remanded,* 606 U.S. 748 (2025). The court held that the "choice between purchasing health insurance that includes religiously objectionable services or forgoing conventional health insurance altogether is an injury-in-fact." *Id.*

In *Braidwood*, the relevant plaintiffs were "six individuals . . . who challenge the legality of the preventive care mandates as violative of the Constitution and [] RFRA." *Braidwood Mgmt. Inc.,* 666 F. Supp. 3d at 618–19. The plaintiffs argued that the preventative care mandate prevented them from obtaining insurance that did not include coverage for certain types of care. *Id.* There, the court found that "there is little doubt that Plaintiffs' injuries . . . are fairly traceable to Defendants' enforcement of the preventive care mandates." *Id.* at 625. The court found that individuals who objected to coverage required in the contraceptive mandate had purchaser standing because they "show[ed that] their opportunity to purchase their desired product, as defined by its core features, has been reduced or eliminated." *Id.* at 623. On appeal, the Fifth Circuit acknowledged that "religious objector"

plaintiffs had standing. *Braidwood Mgmt., Inc.*, 104 F.4th at 957, 939 n.24.[2]

The parties have not cited cases addressing issues that are analogous to those that Dierlam raises here. The only case that the court has found that is analogous to this one is *Soda v. U.S. Office of Pers. Mgmt.*, No. CV 15-898, 2021 WL 533768 (D. Md. Feb. 12, 2021). In *Soda*, the plaintiff challenged the ACA's impact on the Federal Employee Health Benefits plan (FEHB). *Id.* at *1. The plaintiff's complaints in *Soda* are similar to Dierlam's. The ACA required the FEHB to cover certain contraceptive services that the Plaintiffs objected to on religious grounds. *Id.* at *2. The plaintiff in *Soda* identified as a devout Roman Catholic and his religious beliefs forbade any participation in, providing access to, paying for, or otherwise supporting abortion or most methods of contraception. *Id.* The plaintiff sought to enjoin any insurance provider that participated in the FEHB from being required to offer contraceptives. *Id.* at *3. The court characterized the plaintiff's injury as an "injury to his religious practice, stemming from his concern that his voluntary participation in FEHB plans that cover contraception without cost-sharing [would cause] him 'to pay for contraceptive services' provided to others in violation of his religion." *Id.* at *4. The court noted that the Plaintiff's theory was founded on the notion that "in some concrete sense, Plaintiff's healthcare premiums directly fund other plan participants' contraceptive care." *Id.*

The court in *Soda* rejected the plaintiff's argument, noting that the plaintiff was participating in a complex system wherein

---

[2] The court in *Real Alts., Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 360 (3d Cir. 2017), did not address constitutional standing, but reached the merits of the individual plaintiff's claims and thus implicitly found they had standing. As with *Braidwood*, the plaintiffs in *Real Alts.* lodged religious complaints related to the ACA's impact on their private, employer-provided insurance.

his contributions to the program are routed through a pooled fund from which the Office of Personnel Management pays the insurers. *Soda*, 2021 WL 533768, at \*4. The court explained that the plaintiff's fear that a portion of his contributions could hypothetically be used to pay for another participant's contraceptive care was "conjectural." *Id.* The court distinguished cases where an employer directly subsidizes the employee's healthcare. *Id.* (citing *Real Alts. Inc.*, 867 F.3d at 359–60). The court analogized the case to that of a religious taxpayer bringing suit to object to the government's use of income tax revenue. *Id.*

To see the analogy between the FEHB and Medicare, a very brief discussion of Medicare is helpful.[3] "In 2024, Medicare covered over 67.6 million people. Total expenditures in 2024 were just over $1.1 trillion." U.S. CENTERS FOR MEDICARE AND MEDICAID SERVICES, *How is Medicare funded?*, https://www.medicare.gov/about-us/how-is-medicare-funded (last visited Feb. 17, 2026). Medicare is paid for through two trust fund accounts that are held by the U.S. Treasury. *Id.* In turn, those accounts are funded by several sources including payroll taxes, income taxes paid on Social Security benefits, funds authorized by Congress, premiums from individuals enrolled in Medicare Parts A, B, and D, and interest earned on the trust fund investments. *Id.*

Medicare Parts A, B, and D include hospital insurance, medical insurance, and drug coverage. U.S. CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Parts of Medicare*, https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare (last visited Feb. 17, 2026). Medicare Part C, or Medicare Advantage, is a Medicare-approved insurance plan provided by a private company. U.S. DEPARTMENT OF HEALTH

---

[3] The court may take judicial notice of information on government websites. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015); Fed. R. Evid. 201(b).

AND HUMAN SERVICES, *What is Medicare Part C?,* https://www.hhs.gov/answers/medicare-and-medicaid/what-is-me dicare-part-c/index.html (last visited Feb. 17, 2026). Medicare pays a fixed amount to the private companies offering Medicare Advantage Plans to partially fund Medicare Part C. *Id.*

As in *Soda*, the key to Dierlam's argument is that, in some concrete sense, his Medicare premiums, if he were to enroll, would directly fund other plan participants' contraceptive care. Dierlam's alleged injury is no different than the injury a taxpayer suffers when the government makes objectionable use of their tax payments. Generally, the rule against taxpayer standing provides that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 600 (2007) (quoting *Doremus v. Bd. of Ed. of Hawthorne*, 342 U.S. 429, 433 (1952)).

Dierlam's interest in how Medicare funds are used is as remote and uncertain as a taxpayer's interest in the government's use of tax revenues. Again, Medicare covered more than 67 million people in 2024 and is funded from a variety of sources, including two trust fund accounts, which are themselves funded by various taxes, congressionally authorized funds, and premiums from individuals enrolled in Medicare. The idea that Dierlam's premiums, should he enroll in Medicare, would fund another's religiously objectionable care is far too attenuated and speculative to be a concrete, particularized injury. He lacks standing. Every claim and form of relief that Dierlam requests suffers from this same defect.

Dierlam also lacks standing to argue that, because he is unable to enroll in Medicare without violating his religious beliefs, he now faces an increased premium for late enrollment. Because

any injury related to enrolling in Medicare is too attenuated to constitute an injury-in-fact, so too is any penalty based on Dierlam's personal decision not to enroll in Medicare.

The court also notes that any relief in this case would also be completely unworkable. As the Third Circuit has stated, "[m]edical treatments that some might view as objectionable are as varied as they are numerous. Examples that are by no means exhaustive include . . . vaccination; organ transplant from deceased donors; blood transfusions; euthanasia or physician-assisted suicide; and so on." *Real Alts., Inc.*, 867 F.3d at 364 (internal citation omitted). Medicare would simply stop operating if it could not provide coverage for a medical treatment that was objectionable under any citizen's religious beliefs. *See id.*

> Moreover, as the Supreme Court explained fifteen years ago,
>
> Few exercises of the judicial power are more likely to undermine public confidence in the neutrality and integrity of the Judiciary than one which casts the Court in the role of a Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them. In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so. Making the Article III standing inquiry all the more necessary are the significant implications of constitutional litigation, which can result in rules of wide applicability that are beyond Congress' power to change.

*Arizona Christian Sch. Tuition Org.*, 563 U.S. at 145–46.

Dierlam does not have Article III standing. The court therefore does not have jurisdiction to hear Dierlam's case. Defendants' Motion to Dismiss should be **GRANTED** and Dierlam's claims should be **DISMISSED** without prejudice for lack of subject matter jurisdiction.

11

### 3. *Leave to Amend is Denied*

"Dismissing an action after giving the plaintiff only one opportunity to state his case is ordinarily unjustified." *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 310 (5th Cir. 2014) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)). If the plaintiff seeks leave to amend, he "must give the court at least some notice of what . . . [his] amendments would be and how those amendments would cure the initial complaint's defects." *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) (citation omitted). The court may deny leave "[i]f the plaintiff does not provide a copy of the amended complaint [or] explain how the defects could be cured[.]" *Id.* (citation omitted). The court may also deny leave to amend when amendment would be futile or when the plaintiff chooses to stand on his complaint and argues that it satisfies the pleading requirements. *See Khoury v. Thota*, No. 20-20578, 2021 WL 3919248, at *4 (5th Cir. Sep. 1, 2021) (affirming the district court's denial of leave to amend when the plaintiff chose to stand on his complaint and argued that it satisfied the pleading requirements); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (discussing futility of amendment as justification for denying leave to amend).

Here, Dierlam has had an opportunity to amend his Complaint. The court granted Dierlam leave to file an Amended Complaint, and Dierlam filed his FAC thereafter. ECF No. 22. In response to the pending Motion to Dismiss, Dierlam has neither requested to amend nor proposed amendments to his FAC. The court has no reason to believe that Dierlam could further amend his FAC to remedy its defects. Amendment would be futile. Therefore, any request for leave to amend is denied.

### 4. *Motion for Preliminary Injunction*

Because the court recommends that Defendants' Motion to Dismiss be granted, Plaintiff's Motion for Preliminary Injunction, ECF No. 15, should be **DENIED as MOOT.**

### 5. *Conclusion*

The court recommends that Defendants' Motion to Dismiss, ECF No. 30, be **GRANTED**. Dierlam's Motion for Preliminary Injunction, ECF No. 15, should be **DENIED as MOOT**.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas, on February 17, 2026.

_____
Peter Bray
United States Magistrate Judge